T.C. Memo. 2018-157

UNITED STATES TAX COURT

BRIAN BENSON, Petitioner, AND DANNIELLE WELCH-BENSON, Intervenor
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13073-16.                     Filed September 19, 2018.

Brian Benson, for himself.

Dannielle Welch-Benson, for herself.

<u>Karen O. Myrick</u>, for respondent.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  Petitioner seeks relief under section 6015(b), (c), and (f) from joint and several liability stemming from a joint federal income tax return he filed with intervenor, his wife, for tax year 2011.[1]

His wife owned an S corporation that maintained parking meters and collected revenue as a subcontractor for the City of St. Louis.  The S corporation fraudulently overbilled the city for its work, including its work in 2011.  The S corporation reported all of its 2011 income--including the income from the fees attributable to fraudulent overbilling--on its federal income tax return for 2011.  In August 2012, his wife was criminally charged by the U.S. Attorney's Office for the overbilling fraud.  It was then that petitioner, a pharmaceutical sales representative, first learned about the overbilling fraud.  In October 2012, petitioner and his wife filed their 2011 return with the IRS.  Because his wife owned the S corporation, they were required to report the S corporation's income as pass-through income--and they did so.  However, they did not pay the entire resulting tax liability.  On the date the joint return was filed, petitioner had reason

---

[1]Unless otherwise indicated, all section numbers refer to sections of the Internal Revenue Code of 1986, as amended and in effect at all relevant times.  All Rule numbers refer to the Tax Court Rules of Practice and Procedure.

**[*3]** to know that his wife would not or could not pay the tax liability reported on the return because he knew that she had no prospects for earning more money from the City of St. Louis. In tax years before 2011 it was his wife who had made the couple's final federal tax liability payments. In February 2013, his wife went to prison for the fraud. During her prison term, petitioner filed for divorce. His wife was released in September 2014. The divorce is still pending; the couple has split custody of their two sons.

As we hold below, section 6015(b) and (c) relief is not available to petitioner because the joint tax liability in this case is not attributable to an understatement of tax. Further, section 6015(f) relief is not available because petitioner had reason to know that his wife could not or would not pay the joint federal tax liability and because of other facts and circumstances, including that petitioner would not suffer economic hardship if he were to pay the liability.

## FINDINGS OF FACT

The parties have stipulated some of the facts. These facts are adopted by the Court as factual findings. Both petitioner and intervenor (his wife) resided in Missouri when petitioner filed his petition.

Petitioner received a bachelor's degree in biology in 1999. He received a master's degree in business administration in 2007 or 2008.

**[\*4]**  Intervenor received a bachelor's degree in business administration.  She received a master's degree in human resource management.  Intervenor received both degrees before she married petitioner.

On June 20, 2005, petitioner and intervenor got married.  Intervenor was the sole owner of Dankar Enterprise, Inc., a subchapter C corporation that she had started in 1997.  Under their prenuptial agreement, petitioner disclaimed any right to intervenor's premarriage property that was identified in the agreement, and vice versa.  Intervenor's Dankar Enterprise stock was identified in the agreement as part of her premarriage property.  Thus, under the prenuptial agreement petitioner disclaimed any right to the stock of Dankar Enterprise.  (As explained later, the prenuptial agreement was invalidated by a state divorce court in 2016.)

Petitioner was not involved in the day-to-day operations of Dankar Enterprise at any time.  Nor was he an owner or shareholder of Dankar Enterprise at any time.

Starting in 2009, Dankar Enterprise subcontracted to provide day-to-day street parking meter maintenance and revenue collection services to the City of St. Louis.  By 2011 it had 55 to 60 employees.  At intervenor's direction, the company submitted false invoices for its subcontracting work.  As a result, the company

[*5] received more payments in 2009, 2010, and 2011, than it was entitled to. The fraud was unknown to petitioner at the time.

Petitioner and intervenor generally kept separate bank accounts, including a personal account and a business account for each spouse. Neither petitioner nor intervenor used or had access to the other's personal or business bank account. Neither petitioner nor intervenor had knowledge of the other's separate bank account balances throughout the entire term of the marriage.

During 2011, petitioner and intervenor maintained a joint bank account for the payment of household bills. Petitioner generally wrote the checks from the joint account. The checks were used to pay joint household expenses.

Each month, Dankar Enterprise deposited some money into the joint bank account that it reported as wages paid to petitioner for federal tax purposes. Petitioner did little or no work for Dankar Enterprise. Petitioner had his own job as a pharmaceutical sales representative.

Each month, the pharmaceutical company that employed petitioner deposited his wages into his personal bank account. Petitioner kept a certain amount every month in his personal bank account and transferred the rest into the joint bank account. Each month, intervenor also contributed money to the joint bank account. The amount varied by month.

[*6]   Petitioner and intervenor had their joint income tax returns prepared by Neil Packman of Rosenthal, Packman & Co.  Petitioner and intervenor gathered their respective tax documents each year for the preparation of their return.  Generally, intervenor met with Packman to deliver the tax documents relevant to the preparation of the couple's joint income tax return.  Petitioner met with Packman on at least one occasion.  Before filing the couple's electronic tax returns, Packman would send the couple a Form 8879, IRS e-file Signature Authorization.  Once Packman received a Form 8879 signed by both petitioner and intervenor, he would electronically file the tax return.

Packman timely filed the joint income tax returns for petitioner and intervenor for 2005 through 2011.  Packman also prepared and timely filed Dankar Enterprise's federal tax returns for at least 2005 through 2011.

Petitioner's federal income tax returns for 2009 through 2012 were filed as follows:

| Year | Filing status |
|------|---------------|
| 2009 | Joint |
| 2010 | Joint |
| 2011 | Joint |
| 2012 | Separate |

**[*7]**  2009 Joint Return.  The joint return for 2009 showed a balance due of $98,284.  On March 7, 2011, respondent issued petitioner and intervenor a notice of intent to levy to collect the 2009 tax liability.  On March 21, 2011, intervenor contacted respondent and requested an installment agreement under which petitioner and intervenor would fully pay the balance of the 2009 tax liability by July 19, 2011.  Respondent accepted intervenor's proposed installment agreement.  On March 23, 2011, intervenor made a small payment against the 2009 tax liability.  On July 28, 2011, intervenor made a second payment against the 2009 tax liability.  Intervenor made additional payments through November 2011 and fully paid the account.

2010 Joint Return.  On October 10, 2011, petitioner and intervenor filed their 2010 joint income tax return showing a balance due of $51,188.  On December 10, 2011, petitioner and/or intervenor entered into an installment agreement with respondent for payment of the 2010 tax liability.  Petitioner and intervenor failed to meet the requirements of the installment agreement, and it was terminated by respondent.  On March 19, 2012, respondent issued to petitioner and intervenor a notice of intent to levy to collect the unpaid tax liability for 2010.  Intervenor made monthly payments between April and June 2012 to fully pay the 2010 balance.  As petitioner credibly testified, the funds for the additional

**[\*8]** payments (i.e., the payments not made through withholding) for both the 2009 and 2010 tax years ultimately came from Dankar Enterprise's receipts from the City of St. Louis or from the general contractor.

On April 11, 2011, respondent accepted Dankar Enterprise's election to be treated as an S corporation beginning January 1, 2011. In 2011, petitioner and intervenor operated a joint venture called BDA Insurance Group, LLC. It filed a federal partnership income tax return on Form 1065, U.S. Return of Partnership Income, for 2011. During 2011, intervenor also owned Dankar Realty, Inc., an S corporation.

On August 16, 2012, petitioner learned that intervenor was going to be criminally charged for the overbilling fraud.

On August 20, 2012, intervenor was charged with fraud. Specifically, intervenor was alleged to have defrauded the general contractor and the City of St. Louis by causing Dankar Enterprise to submit false invoices to the general contractor for work that was not performed. It was alleged that Dankar Enterprise made sham consulting payments as part of the scheme. In particular it was alleged that:

- Dankar Enterprise made sham consulting payments to an unnamed person who had blackmailed intervenor by threatening to reveal that Dankar Enterprise was submitting false invoices;

**[*9]** • Dankar Enterprise made sham consulting payments to intervenor; and

• at the direction of the Treasurer's Office of the City of St. Louis, Dankar Enterprise made sham consulting payments to a second unnamed person.[2]

The criminal charges were made through the filing of an information with the U.S. District Court for the Eastern District of Missouri by an Assistant U.S. Attorney.[3] On the same day, August 20, 2012, intervenor pleaded guilty to the charges in the information.

On October 14, 2012, petitioner and intervenor filed a joint federal income tax return for 2011. Both petitioner and intervenor authorized Packman to file their 2011 joint income tax return electronically. On that return petitioner and intervenor reported they earned wages of $323,464, comprising:

• $140,497 of wages paid to petitioner as a pharmaceutical representative,

• $12,300 paid to petitioner by Dankar Enterprise, and

---

[2]This seems to be an allegation that someone in the city treasurer's office was operating a kickback scheme.

[3]To be prosecuted for a felony in federal court, a person must be indicted by a grand jury. Fed. R. Crim. P. 7(a)(1). However, a person can waive the right to be indicted, in which case the person may be prosecuted by an information. Fed. R. Crim. P. 7(b). An information is a statement of the essential facts constituting the offense charged and is signed by a prosecuting attorney. Fed. R. Crim. P. 7(c)(1).

[*10] ● $170,667 paid to intervenor by Dankar Enterprise.

They reported on a Schedule E, Supplemental Income and Loss, that intervenor

earned $196,821 of pass-through income from Dankar Enterprise.

Petitioner and intervenor reported a total tax liability on their 2011 return of

$136,947. They also reported they owed a $770 estimated-tax penalty, which

brought the total liability to $137,717. They reported $68,204 in withholdings.

They did not make any payments with the return, which showed an unpaid tax

liability of $69,513. Respondent did not mail a notice of deficiency to petitioner

or intervenor for tax year 2011. Petitioner's income tax liability for 2011 is the

(partly unpaid) income tax liability reported on the jointly filed income tax return

for 2011.

On December 13, 2012, intervenor was sentenced to 27 months in prison for

the overbilling fraud. In February 2013, intervenor went to prison. It was then

that petitioner and intervenor first began living apart. While intervenor was in

prison, their two sons resided with petitioner.

In March 2013, petitioner paid the Missouri state income tax due for 2011.

Starting with the 2012 tax year, petitioner engaged one of intervenor's tax

advisers, Alma Scarborough, to prepare his federal income tax returns. Each year

(1) petitioner gathered his own tax documents and mailed them to Scarborough,

[*11] (2) petitioner reviewed his return, (3) Scarborough mailed him a Form 8879 to sign before electronically filing his return, and (4) petitioner signed and returned the Form 8879 to Scarborough. On October 16, 2013, petitioner filed a married-filing-separately federal income tax return for 2012 reporting $27,159 in wage income from Dankar Enterprise. Dankar Enterprise deposited payments, recorded as petitioner's wages, into the joint bank account during 2012.

In July 2014, petitioner filed for a divorce from intervenor. At some point in 2014, petitioner and intervenor became legally separated.

In September 2014, intervenor was released from prison. Intervenor did not move back in with petitioner. From September 2014 petitioner and intervenor split joint custody of their sons.

For tax years 2013 and 2014, petitioner did not pay the entire amounts of tax reported on his returns until respondent issued notices of intent to levy.

On January 27, 2015, petitioner filed with respondent a Form 8857, Request for Innocent Spouse Relief, for 2011. He also requested relief from joint liability for 2012; but because he filed a separate return for 2012, he had no joint liability from which to be relieved.

On or about November 13, 2015, respondent preliminarily determined to grant petitioner full relief from the joint income tax liability for 2011. Also on

[*12] November 13, 2015, respondent mailed to intervenor a letter informing her that respondent had preliminarily granted petitioner full relief from the joint income tax liability for 2011. The letter informed intervenor that she had a right to dispute the preliminary determination.

On November 16, 2015, intervenor submitted to respondent a Form 12509, Statement of Disagreement, objecting to the preliminary determination to relieve petitioner of the joint income tax liability for 2011.

On March 10, 2016, respondent issued to petitioner a final determination for 2011 fully denying petitioner's request for relief. Also on March 10, 2016, respondent notified intervenor of his decision to fully deny petitioner's request for relief from the joint income tax liability for 2011.

On November 1, 2016, the Circuit Court of St. Charles County, the court handling the divorce proceeding, declared the prenuptial agreement invalid because it did not disclose the values of any assets and therefore did not evidence that petitioner and intervenor were aware of the full extent of the rights they were giving up.

In November 2017, trial was held. Petitioner and intervenor were still married at the time of trial. Petitioner continues to work as a pharmaceutical sales representative.

**[*13]**                                        OPINION

In general, a spouse who files a joint federal income tax return is jointly and severally liable for the entire tax liability. Sec. 6013(d)(3). A spouse may be relieved of the liability under section 6015. There are three particular mechanisms under which relief is afforded, found in section 6015(b), (c), and (f), respectively. Because there is no understatement or deficiency for 2011, neither section 6015(b) nor (c) relieves petitioner of any portion of the joint liability for 2011. See Hopkins v. Commissioner, 121 T.C. 73, 88 (2003); see also Block v. Commissioner, 120 T.C. 62, 66 (2003). Thus, the only mechanism by which petitioner could be afforded relief is section 6015(f).

In determining whether petitioner is entitled to section 6015(f) relief we apply a de novo standard of review. See Porter v. Commissioner, 132 T.C. 203, 210 (2009). This means that we do not defer to respondent's determination to deny relief to petitioner. Wilson v. Commissioner, 705 F.3d 980, 992 (9th Cir. 2013), aff'g T.C. Memo. 2010-134. A fortiori we do not defer to respondent's preliminary determination, which was to grant relief to petitioner.

Our determination employs a de novo scope of review. Porter v. Commissioner, 132 T.C. at 210. This means we hear evidence in addition to the administrative record compiled by respondent. See Wilson v. Commissioner, 705

**[\*14]** F.3d at 987.  Petitioner bears the burden of proving he is entitled to relief.

See Porter v. Commissioner, 132 T.C. at 210 (citing Rule 142(a)).

Section 6015(f) provides that under procedures prescribed by respondent, if, taking into account all the facts and circumstances, it is inequitable to hold an individual liable for any unpaid tax or any deficiency and relief is not available to such individual under subsection (b) or (c), respondent may relieve such individual of liability.  As directed by section 6015(f), respondent has issued a revenue procedure to guide his employees in determining whether a taxpayer is entitled to such equitable relief from joint and several liability.  Rev. Proc. 2013-34, 2013-43 I.R.B. 397, modifying and superseding Rev. Proc. 2003-61, 2003-2 C.B. 296.  Rev. Proc. 2013-34, supra, provides a three-step analysis for respondent's personnel to follow in evaluating requests for equitable relief under section 6015(f).  The Court consults this analysis when reviewing respondent's denial of relief.  See Washington v. Commissioner, 120 T.C. 137, 147-152 (2003). Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399, lists threshold conditions that must be met before respondent will grant any equitable relief under section 6015(f); Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. at 400, lists three elements that, if met, require respondent to grant "streamlined" relief when the threshold conditions are met; and Rev. Proc. 2013-34, sec. 4.03, 2013-43 I.R.B. at 400, sets

[*15] forth seven nonexclusive factors that respondent will consider in determining whether equitable relief should be granted when the threshold conditions are met but streamlined relief is not available because of the nonsatisfaction of any of the three elements.

1.     The threshold conditions

Rev. Proc. 2013-34, sec. 4.01, sets forth threshold conditions that must be satisfied before respondent will consider a request for equitable relief under section 6015(f).  There is no dispute that petitioner satisfies all the threshold conditions except the following condition:  "The income tax liability from which the requesting spouse seeks relief is attributable (either in full or in part) to an item of the nonrequesting spouse or an underpayment resulting from the nonrequesting spouse's income."  Rev. Proc. 2013-34, sec. 4.01(7).  We need not determine whether this threshold condition is met; even if it is met, petitioner is not entitled to equitable relief, as we explain below.

2.     The three requirements for streamlined relief

Rev. Proc. 2013-34, sec. 4.02, states that when the threshold conditions of section 4.01 are met, the requesting spouse qualifies for a streamlined determination of relief under section 6015(f) if the following three requirements are met:

**[*16]** ● the requesting spouse is no longer married to, or is separated from, the nonrequesting spouse at the time respondent makes his determination;

● the requesting spouse will suffer economic hardship if relief is not granted; and

● in an underpayment case, the requesting spouse had no knowledge or reason to know when the return was filed that the nonrequesting spouse would not or could not pay the tax liability reported on the joint tax return.

See Rev. Proc. 2013-34, sec. 4.02. All three requirements must be met in order for the requesting spouse to qualify for a streamlined determination. Id. We discuss each of these infra parts 2.a, 2.b, and 2.c, respectively.

a. Marital status

Petitioner was separated from intervenor when respondent made his determination. The first requirement--marital status--is met.

b. Economic hardship

The second requirement is that the requesting spouse will suffer economic hardship if relief is not granted. Id. sec. 4.03(2)(b). "[E]conomic hardship exists if satisfaction of the tax liability in whole or in part will cause the requesting spouse to be unable to pay reasonable basic living expenses." Id. In determining whether the requesting spouse will suffer economic hardship, respondent is to consider the requesting spouse's current income and expenses and the requesting

[*17] spouse's assets; furthermore, respondent is to base his determination on rules similar to section 301.6343-1(b)(4), Proced. & Admin. Regs. Rev. Proc. 2013-34, sec. 4.03(2)(b). Section 301.6343-1(b)(4), Proced. & Admin. Regs., provides that in determining a reasonable amount for basic living expenses, respondent is to consider any information provided by the taxpayer (i.e., the requesting spouse), including:

> The amount reasonably necessary for food, clothing, housing (including utilities, home-owner insurance, home-owner dues, and the like), medical expenses (including health insurance), transportation, current tax payments (including federal, state, and local), alimony, child support, or other court-ordered payments, and expenses necessary to the taxpayer's production of income (such as dues for a trade union or professional organization, or child care payments which allow the taxpayer to be gainfully employed) * * *

Respondent will consider that the requesting spouse would suffer economic hardship if two tests are met: (1) either (a) the requesting spouse's income is below 250% of the federal poverty level or (b) the requesting spouse's monthly income exceeds the requesting spouse's reasonable basic monthly living expenses by $300 or less and (2) the requesting spouse does not have assets from which the requesting spouse can make payments toward the tax liability and still meet reasonable basic living expenses. Rev. Proc. 2013-34, sec. 4.03(2)(b). If these two tests are not met, respondent considers all facts and circumstances in

[*18] determining whether the requesting spouse would suffer economic hardship if relief is not granted.  Id.  As explained infra part 2.b.i, we find that petitioner's current income is $12,717 per month, which is far in excess of 250% of the federal poverty level.  And, as explained infra part 2.b.ii, we find that petitioner's reasonable basic living expenses are $10,184, which means his monthly income exceeds his reasonable basic monthly living expenses by $2,533.  Therefore, petitioner does not meet the first test.  It is unnecessary to determine whether petitioner has assets from which he can make payments toward the tax liability and still meet reasonable basic living expenses, i.e., the second test.  After considering all facts and circumstances, we conclude that petitioner would not suffer economic hardship if he is not relieved of the joint liability.

i.     Petitioner's current monthly income is $12,717.

Petitioner credibly testified that his current annual salary is $133,000 and that he earns an additional $7,000 of annual bonuses.  He also credibly testified that he receives $1,050 per month in installment payments from the previous sale of a business.  Petitioner's position on brief is that he earns $10,833 per month.  But it is unclear how he calculated this amount.  And it is contradicted by his testimony.  We conclude that petitioner's current monthly income is $12,717 = ($140,000/12) + $1,050.

**[\*19]**     ii.     <u>Petitioner's reasonable basic living expenses are $10,184 per month</u>.

(1)     <u>$1,069 for food and personal care</u>

The preprinted Form 8857 lists various categories of expenses and subcategories within each category.

One category is food and personal care.  The subcategories for this category are:  food, housekeeping supplies, personal care products and services, and clothing and clothing services.  Petitioner's Form 8857 claimed a total of $1,350 in the subcategories of the food-and-personal-care category.  On brief, respondent contends that $1,069 is the maximum allowed in the food-and-personal-care category, citing as authority section 301.6343-1(b)(4), Proced. & Admin. Regs.  Respondent does not contend that the actual amount of expenses in this category is less than $1,069.  Therefore, we consider respondent to have conceded that the amount in this category is $1,069.  Petitioner's brief makes no response to respondent's argument that the expenses in this category are limited to $1,069.  We consider petitioner to have conceded that the amount is limited to $1,069.  Petitioner's brief states that the amount of expenses in this category is $700, but we believe that this is a miscalculation.  We do not consider that petitioner has conceded that the appropriate amount is only $700.

**[*20]** We conclude that petitioner has $1,069 in monthly expenses in this category.

### (2) Zero for transportation

The transportation category has two subcategories: (1) auto loan/lease payment, gas, insurance, licenses, parking, maintenance, etc. and (2) public transportation. Petitioner stated on his Form 8857 that he had $250 in the first subcategory and did not state that he had any expenses in the second. Petitioner credibly testified that he owns no car, that he uses a company car, and that he has no car expenses. In his brief he did not claim that he had any expenses in the transportation category.

Petitioner has conceded that he has no expenses in the transportation category. Furthermore, the evidence shows that he had none. We conclude that petitioner has zero in monthly expenses in this category.

### (3) $2,975 for house and utilities

For the category for house and utilities, petitioner claimed on his Form 8857 the following amounts in the subcategories: $1,975 for rent or mortgage; $100 for real estate taxes and insurance; $700 for electric, oil, gas, water, trash, etc; $150 for telephone and cell phone; and $150 for cable and internet. Respondent's brief supplied no reasons for disagreeing with the amounts of the expenses reported on

[*21] the Form 8857. Therefore, we consider respondent to have conceded these amounts.[4] The exception is the $100 for real estate taxes and insurance. Petitioner credibly testified that he no longer owns a home and that therefore he does not pay taxes or insurance on a house. In his brief he did not claim that he had any expenses in the subcategory for real estate taxes and insurance. He has therefore conceded that he has no expenses in the subcategory for real estate taxes and insurance. Furthermore, the evidence shows that he had no expenses in the subcategory for real estate taxes and insurance. We conclude that petitioner has zero in monthly expenses in the subcategory for real estate taxes and insurance.

We conclude that petitioner has $2,975 of expenses in the category for house and utilities, comprising $1,975 for rent or mortgage; $700 for electric, oil, gas, water, trash, etc.; $150 for telephone and cell phone; and $150 for cable and internet.

### (4)    Zero for medical

The category for medical on the Form 8857 is composed of two subcategories: health insurance premiums and out-of-pocket expenses. In petitioner's brief, he claims that he has $600 in expenses in the medical category.

---

[4]Although petitioner testified his rent was $2,000, we gather he was rounding up from $1,975, the amount on the Form 8857.

**[\*22]** However, he does not point to any evidence of this amount.  Nor are we aware of any such evidence in the record.

We conclude that petitioner has zero in expenses in this category.

(5)    $6,140 for expenses in the "other" category.

The last category on Form 8857 is "other" expenses.  The subcategories in this "other" category are the following:  child and dependent care; caregiver expenses; income tax withholding; estimated tax payments; term life insurance premiums; retirement contributions (employer required); retirement contributions (voluntary); union dues; unpaid state and local taxes (minimum payment); student loans (minimum payment); court-ordered debt payments (i.e., child support); and miscellaneous.

(a)    $900 for child and dependent care expenses

Respondent concedes that petitioner has $900 in expenses in the subcategory for child and dependent care.

(b)    $100 for caregiver expenses

Respondent concedes that petitioner has $100 in expenses in the subcategory for caregiver expenses.

**[*23]**                    (c)    $3,350 for income tax withholding

Petitioner's brief does not quantify the amount he claims is withheld for income tax. Respondent contends that petitioner has $3,350 of expense in this subcategory. This amount roughly corresponds to actual withholding for 2015 and 2016. We hold that the amount is $3,350.

                    (d)    Zero for estimated tax payments

Although petitioner claimed $100 in this subcategory, his brief concedes that this amount is zero.

                    (e)    Zero for retirement contributions (employer required)

Petitioner did not claim an amount in this subcategory on his Form 8857 or in his brief.

                    (f)    Zero for retirement contributions (voluntary)

Petitioner contends that he has $650 of expenses for voluntary retirement contributions. However, petitioner has not shown that his voluntary contributions to his retirement plan are a condition of his continued employment. They are not basic living expenses. See Rev. Proc. 2013-34, sec. 4.03(2)(b) (adopting section 301.6343-1(b)(4), Proced. & Admin. Regs.); see also Yancey v. Commissioner,

[*24] T.C. Memo. 2017-59, at *21 (no economic hardship because requesting spouse could withdraw from section 401(k) plan).

(g)     Zero for union dues

Petitioner did not claim an amount in this subcategory on his Form 8857 or in his brief.

(h)     Zero for unpaid state and local taxes (minimum payment)

Petitioner did not claim an amount in this subcategory on his Form 8857 or in his brief.

(i)     $190 for student loans (minimum payment)

Respondent concedes that this amount is $190.

(j)     $1,200 for court-ordered debt payments (i.e., child support)

Respondent concedes that this amount is $1,200.

(k)     $150 for miscellaneous

Petitioner claimed that he had $150 of miscellaneous expenses on his Form 8857.  Respondent's brief agrees that $150 is the appropriate amount.  On brief, petitioner contends that he has miscellaneous expenses of $2,500 of credit card expenses and $350 for "childrens' activities".  Petitioner does not point to evidence of these amounts.  And we cannot be sure that these amounts were not

[*25] counted in other categories or subcategories. We conclude that petitioner has $150 of miscellaneous expenses.

c.      Reason to know

As to the third requirement (i.e., no reason to know about the underpayment), we find that when the 2011 return was filed petitioner had reason to know that the tax liability reported on the return would not, and could not, be paid by intervenor. See Rev. Proc. 2013-34, sec. 4.02(3)(a), 4.03(2)(c)(ii). The liabilities reported on the couple's joint returns, up to and including tax year 2011, had been prepaid in part by withholding from petitioner's wages. This left substantial unpaid balances, which intervenor eventually paid (except for the unpaid balance for the 2011 tax year). For tax years 2009 and 2010, these payments--made through installment agreements and under threats of levies--were made a year after each respective return was filed. As petitioner testified, the ultimate source of the money intervenor used to make these payments was Dankar Enterprise's receipts from the City of St. Louis or from the general contractor. (Intervenor appears to have accessed Dankar Enterprise's profits by having Dankar Enterprise (1) pay wages to her and petitioner and (2) pay consulting fees to her.) On August 16, 2012, petitioner learned that intervenor would be charged with fraud. On August 20, 2012, the charges were made through an information,

[*26] and intervenor pleaded guilty. On October 14, 2012, petitioner and intervenor filed their joint return for 2011. The return reported a pre-payment tax liability of $137,717, which, reduced by $68,204 of payments, resulted in an unpaid tax liability of $69,513. Petitioner testified that intervenor was unable to pay this remaining amount because the City of St. Louis and the general contractor stopped paying Dankar Enterprise after she was charged with fraud. Petitioner had reason to know that intervenor was unable to pay the remaining tax liability at the time they filed the return. Therefore he had reason to know that intervenor would not, or could not, pay the $69,513 unpaid balance.

Petitioner argues on brief that although he was aware that there was a $69,513 unpaid balance when the return was filed, he thought that intervenor would pay the balance because she had paid the balances for prior tax years. Thus, he contends, he "had no reason to believe the 2011 tax bill would not be paid by * * * [intervenor]." He contends that he was not aware that the couple had initially failed to timely pay their tax liabilities for 2009 and 2010. We need not determine whether petitioner thought that the 2009 and 2010 tax liabilities were timely paid. The tax liability for year 2011 was entirely different. When petitioner and intervenor filed the 2011 tax return, petitioner had reason to know

[*27] that Dankar Enterprise would no longer be a source of funds for intervenor and that intervenor could not and would not pay the unpaid tax liability.

Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii), states that "[a] reasonable expectation of payment will be presumed if the spouses submitted a request for an installment agreement to pay the tax reported as due on the return." See id. sec. 4.02(3)(a) (cross-referencing section 4.03(2)(c)(ii)). Petitioner argues that he should be presumed to have had a reasonable expectation that intervenor would pay the 2011 liability because she had paid the 2009 and 2010 liabilities through installment agreements. However, no installment agreement was submitted to pay the 2011 liability. Therefore, petitioner cannot benefit from this presumption.

Petitioner also argues that the conversion of Dankar Enterprise from a C corporation to an S corporation resulted in an unanticipated increase in the couple's joint tax liability for 2011 compared to prior years. As a C corporation Dankar Enterprise was taxable on its own income, and intervenor was not taxable on Dankar Enterprise's income. See sec. 11(b). When Dankar Enterprise became an S corporation effective 2011, its income was attributed to intervenor, its sole shareholder. See sec. 1366(a)(1), (c). It appears that when Dankar Enterprise changed from C to S status in 2011, intervenor partially avoided the potential increase in personal tax liability by eliminating the payment of fake consulting

[*28] income that had been reported on her Schedules C, Profit or Loss From Business, for prior years. Despite this change, however, the joint tax liability still increased for tax year 2011. These points can be illustrated by the chart below:

| Major sources of income reported for petitioner and intervenor | | | |
|---|---|---|---|
| | Tax year | | |
| Source of income as reported | 2009 | 2010 | 2011 |
| Income reported by Dankar Enterprise as C corporation in 2009 and 2010; as S corporation in 2011 | $182,846 | $152,686 | $196,821 |
| Petitioner's wages from pharmaceutical sales | 130,688 | 121,793 | 140,497 |
| Petitioner's wages from Dankar Enterprise | 1,000 | 18,400 | 12,300 |
| Intervenor's wages from Dankar Enterprise | Not in record | 76,597 | 170,667 |
| Total wages reported by both petitioner and intervenor | 155,340 | 216,791 | 323,464 |
| Intervenor's Schedule C fees for consulting services | 230,000 | 154,403 | -0- |
| Taxable distributions from Dankar Enterprise to intervenor | -0- | -0- | -0- (It was an S corporation for this year.) |

| [*29] Intervenor's pass-through income from Dankar Enterprise as S corporation | -0-<br>(It was a C corporation for this year.) | -0-<br>(It was a C corporation for this year.) | $196,821 |
|---|---|---|---|
| Taxable income (includes other items of income and loss not listed in the rows above) | 408,734 | 380,327 | 529,801 |
| Tax (not including estimated tax penalty) | 106,335 | 93,840 | 136,947 |

While it may be true that the conversion from C to S status caused an increase in the joint income tax liability, this increase was not unanticipated when petitioner signed the 2011 return in October 2012. The pass-through income from Dankar Enterprise was reported on the 2011 joint return, it was included in the joint taxable income reported on the return, and it was reflected in the tax reported on the return. As petitioner testified, he saw that there was a $69,513 balance on the return and that this liability was unpaid. He knew that intervenor had paid the unpaid balances from prior years using the revenue from her business, Dankar Enterprise. He also knew that after the criminal charges these revenues would not be available to her to pay the unpaid 2011 balance.

[*30] Petitioner also argues that he did not know about intervenor's fraudulent scheme involving Dankar Enterprise's false invoices. We believe he did not know about the scheme. However, the relevant question is whether he knew or had reason to know that the tax liability reported on the 2011 return would not and could not be paid by intervenor. See Rev. Proc. 2013-34, sec. 4.02(3)(a). We hold that he knew or had reason to know that the tax liability reported on the 2011 return would not and could not be paid by intervenor.

Finally, Rev. Proc. 2013-34, sec. 4.02(3)(a), states:

> If the nonrequesting spouse * * * maintained control over the household finances by restricting the requesting spouse's access to financial information, and because of the * * * financial control, the requesting spouse was not able to * * * question the payment of the taxes reported as due on the joint return or challenge the nonrequesting spouse's assurance regarding payment of the taxes, for fear of the nonrequesting spouse's retaliation, then the * * * financial control will result in this factor being satisfied even if the requesting spouse knew or had reason to know * * * that the nonrequesting spouse would not pay the tax liability.

Petitioner argues that intervenor restricted his access to information about Dankar Enterprise. Even if the information was restricted, petitioner did not show that he feared intervenor's retaliation. Therefore this requirement is not treated as satisfied.

**[*31]** Petitioner is therefore not eligible for streamlined relief under Rev. Proc. 2013-34, sec. 4.02.

3.    Factors considered in granting or denying equitable relief

Rev. Proc. 2013-34, sec. 4.03, states that equitable relief under section 6015(f) may be granted if, taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse responsible for all or part of the liability.  In making the decision, respondent weighs a number of factors, including, but not limited to, the requesting spouse's (1) marital status, (2) possible economic hardship if relief is not granted, (3) knowledge or reason to know that the tax liability would or could not be paid, (4) legal obligation to pay the outstanding federal income tax liability, (5) receipt of a significant benefit from the unpaid income tax liability, (6) compliance with income tax laws, and (7) mental or physical health at the time of filing.

a.    Marital status

This factor weighs in favor of relief if the requesting spouse was no longer married to, or was separated from, the nonrequesting spouse when respondent made his determination.  Rev. Proc. 2013-34, sec. 4.03(2)(a).  Petitioner was separated from intervenor when respondent made his determination.  This factor weighs in favor of relief.

[*32] b.    Economic hardship

No economic hardship would result from requiring petitioner to pay the joint tax liability.  See supra part 2.b.  This factor is therefore neutral as to whether relief should be granted.  See Rev. Proc. 2013-34, sec. 4.03(2)(b).

c.    Knowledge or reason to know of intervenor's inability to pay

It was not reasonable for petitioner to believe that intervenor would or could pay the tax liability shown on the 2011 return.  See supra part 2.c.  Therefore this factor weighs against relief.  See Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii).

d.    Legal obligation

A legal obligation in a divorce decree or other legally binding agreement regarding tax liability will weigh in favor of relief, if the nonrequesting spouse is to pay, or against relief, if the requesting spouse is to pay.  Rev. Proc. 2013-34, sec. 4.03(2)(d).  Petitioner's and intervenor's divorce decree is not final, and there is no other legally binding agreement regarding tax liability.  Therefore, this factor is neutral.

e.    Significant benefit

This factor concerns whether the requesting spouse significantly benefited from the unpaid income tax liability.  Rev. Proc. 2013-34, sec. 4.03(2)(e), states that a significant benefit is any benefit in excess of normal support and that if the

**[\*33]** requesting spouse enjoys the benefits of a lavish lifestyle, such as owning luxury assets and taking expensive vacations, this factor will weigh against relief. This factor does not weigh against relief in this case. Petitioner did not receive any benefit in excess of normal support. Nor did he live a lavish lifestyle.

Rev. Proc. 2013-34, sec. 4.03(2)(e), states that this factor will weigh in favor of relief only if the nonrequesting spouse significantly benefited from the unpaid tax and the requesting spouse had little or no benefit. We believe that petitioner benefited from the unpaid 2011 tax liability. Although it was intervenor who customarily made the final payments for previous tax years, and therefore benefited from not paying the balance of the 2011 tax liability, petitioner's financial status was intertwined with intervenor's. The two shared a joint bank account into which intervenor directed money. Therefore this factor does not weigh in favor of relief.

We conclude that this factor is neutral.

f.     Tax compliance

Whether petitioner was in compliance for tax years after 2011 will weigh for or against relief. See Rev. Proc. 2013-34, sec. 4.03(2)(f)(iii). Although petitioner timely filed his returns for the years following 2011, he did not timely

[*34] pay his income tax liabilities for 2013 and 2014 and did not make a good-faith effort to do so.

This factor weighs against relief.

g.      Mental or physical health

Petitioner has not shown he was in poor physical or mental health at the time the 2011 return was filed.  See Rev. Proc. 2013-34, sec. 4.02(2)(g).  This factor is neutral.

4.      Conclusion

Weighing all the facts and circumstances, we are not persuaded that it would be inequitable to deny petitioner relief from joint and several liability under section 6015(f) for tax year 2011.  The marital-status factor favors relief.  Two factors (knowledge or reason to know and tax compliance) weigh against relief.  The remaining factors  (economic hardship, legal obligation, significant benefit, and mental or physical health) are neutral.  Considering that petitioner had reason to know that intervenor would not or could not pay the tax liability reported on the 2011 return, and in the absence of economic hardship, we conclude that it would not be inequitable to deny petitioner relief under section 6015(f) for tax year 2011.

Petitioner is not entitled to relief under section 6015(b), (c), or (f).  Our decision will therefore favor respondent.

**[*35]** To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.